**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ____________________

COMPASS, INC. and COMPASS COLORADO, LLC,

Plaintiffs,

v.

METROLIST, INC., d/b/a REcolorado,

Defendant.

---

**COMPLAINT FOR VIOLATION OF 15 U.S.C. § 1 AND JURY DEMAND**

---

**INTRODUCTION**

1. Homeowners should be free to choose how to sell their own homes without having a competition-killing real estate industry organization tell them how to do it. Real estate agents should be able to compete fiercely to be hired by clients, and real estate brokers should be able to compete to attract agents to their firms, without their competitors banding together to restrict how they compete. In dozens of cities across the country, homeowners and agents are free to do that. But this much-needed competition and choice are blocked in 21 Colorado counties because of rules set and enforced by Defendant Metrolist, Inc., d/b/a REcolorado ("REcolorado"), and agreed to by the competing brokers and agents who participate in it. Approximately 25,000 brokers, agents, and appraisers participate in REcolorado, and the brokers and agents among them compete with Plaintiffs Compass, Inc. and Compass Colorado, LLC (collectively, "Compass") and their agents. Through their agreement to REcolorado's rules, they are dictating how Compass and its agents can and cannot compete, how Compass and its agents can and cannot serve their clients, and how

homeowners can and cannot market their own homes. Plaintiffs bring this lawsuit under 15 U.S.C. § 1 to stop REcolorado's anticompetitive behavior.

2. Homeowners want a choice. Compass offers a phased marketing strategy, See It First™ on Compass, that gives homeowners that choice. Some homeowners choose to use a multiple listing service ("MLS") to market their homes. Some want to publicly market their homes before they go into the MLS—through internet websites, yard signs, social media, and newsletters, among other public marketing methods. Compass and its agents do not force homeowners to use phased marketing or any other strategy; in fact, Compass requires the homeowners' written approval to publicly market outside of REcolorado. Under Colorado law, homeowners are entitled to decide how to market their own properties.

3. One reason homeowners like having this choice is that they can use pre-MLS public marketing to test the price of a home with real-world feedback from agents and their clients, which helps ensure the home is not overpriced when it lists in the MLS and the MLS distributes the listing to real estate websites and data vendors around the world. Moreover, this strategy helps agents and their clients gather feedback on price without the risk of their listings being permanently soiled by price cuts and extended "days on market" that hurt the perceived value of the homes. Homeowners love this choice: where MLSs allow phased marketing, approximately 48% of Compass homeowners used it. Even when publicly marketed pre-MLS, the vast majority of those listings actually sold in the last phase (after being submitted to the MLS). Compared with listings sent straight to the MLS, as REcolorado requires, homes using phased marketing have sold for 4.6% more, with 34% fewer days on the MLS and 29% fewer price cuts.

4. REcolorado, which describes itself as "the largest Multiple Listing Service (MLS) in Colorado," with a service area spanning the Denver metropolitan area and surrounding regions, is a combination of Compass' direct competitors: approximately 25,000 competing brokers, agents, and appraisers, each of whom has agreed to follow the MLS's adopted rules.[1] Under Sections 1.0 and 1.02 of REcolorado's MLS Policy and its Appendix A (the "Anticompetitive Rules"), once a homeowner markets the home anywhere on the internet, posts the home anywhere on social media, puts up a yard sign, sends an email blast, or publicly markets the home in any way REcolorado defines as "public marketing," the listing must be given to REcolorado and its co-conspirators within one day—including weekends and holidays—and the agent and homeowner must follow the roughly 70 pages of REcolorado restrictions—even if the homeowner gave the agent a lawful marketing instruction that conflicts with the REcolorado rules.

5. Although Colorado law requires a real estate agent engaged as a seller's agent to promote the seller's interests with the utmost good faith, loyalty, and fidelity,[2] if a real estate agent follows the client's lawful instruction to publicly market a home outside of REcolorado, the agent then faces warnings, fines, referral to REcolorado's MLS Policy Council for fines of up to $15,000, suspension, or termination from the very MLS they need to do business.[3] More than 40 years ago, in its seminal report on U.S. residential real estate, the U.S. Federal Trade Commission ("FTC")

---

[1] *About*, REcolorado, https://recolorado.com/about/.

[2] Colo. Rev. Stat. § 12-10-404(1)(c).

[3] REcolorado, MLS Policy §§ 1.0, 8.1 (rev. Apr. 2026) ("MLS Policy"), *available at Ariz. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-09253-MKV (S.D.N.Y. Oct. 30, 2026), ECF No. 28-7.

warned that when an MLS forces members to submit their listings, "[a]lternative methods of selling houses are effectively foreclosed."[4] That is what REcolorado has done.

6. Compass brings this lawsuit to stop these illegal rules. Competitors may not band together to dictate how their rivals serve customers and deprive homeowners of choice. Yet that is what REcolorado is doing: using control of a home listing database that real estate agents in the Denver metropolitan area and surrounding regions cannot work without, REcolorado and its co-conspirators block Compass' better home marketing product to protect Compass' competitors from having to compete with Compass on the merits for clients and agents.

7. Instead of fixing its anticompetitive rules, REcolorado has ignored Compass' demand that it stop fining agents for publicly marketing listings outside the MLS. REcolorado's excuses for punishing agents for phased marketing are meritless. MLSs serving more than 350,000 brokers and agents in at least 12 states do not fine or punish pre- or off-MLS public marketing, and in these markets, the issues REcolorado claims will result from pre- or off-MLS public marketing have not transpired. Indeed, on information and belief, until 2020, REcolorado had no rule penalizing agents for publicly marketing listings that were not submitted to the MLS. To the contrary, REcolorado's rules permitted a homeowner to direct that her listing not be filed with the MLS at all, and expressly contemplated that brokers would place for-sale signs on properties not submitted to the MLS.[5] But now, in its lawsuit, REcolorado claims the Anticompetitive Rules are

---

[4] FTC, The Residential Real Estate Brokerage Industry ("Butters Report") at 130 (Dec. 1983).

[5] REcolorado, *MLS Rules & Regulations* §§ 1.0, 1.4.1, at 7; § 3.1, at 13 (rev. Aug. 2017), https://web.archive.org/web/20180219160213/http://cms.recolorado.com/sites/default/files/docs/MLS-Rules-and-Regulations.pdf ("2017 Rules").

necessary to promote “transparency” and prevent “free riding.” REcolorado does not care about homeowners; it is a members-only database that homeowners are unable to access and that fines agents just for following their client’s lawful public marketing instructions. Moreover, Compass does not “free ride” as REcolorado claims; it pays REcolorado dues and it is a significant contributor of listings to REcolorado.

8. REcolorado and its co-conspirators have caused substantial economic harm to Compass and its agents, in addition to the immense harm REcolorado has caused to homeowners. Compass seeks treble damages, to the full extent allowed by the law, for every dollar of harm REcolorado and its co-conspirators caused Compass. Compass paid over $175 million to defend and settle lawsuits resulting from MLS policies it could not avoid because rules like REcolorado’s foreclosed the option for Compass’ agents to publicly market a home without giving it to REcolorado, thus forcing them to follow REcolorado’s policies. Although the settlements were the result of MLS rules, REcolorado paid nothing. REcolorado forces Compass and its agents to give their valuable home listing data to REcolorado, which REcolorado then licenses and sells to third parties—including through REdistribute, a data-sales venture that REcolorado co-owns, and through HouseCanary, which delivers REcolorado listings for display in Google search results without compensating Compass. Because REcolorado stops Compass from avoiding REcolorado’s rules and because, upon information and belief, REcolorado licenses Compass’ data to companies whose products are used against Compass and its agents, Compass has lost commissions on listings and agents it could not win without the ability to offer See It First™ on Compass, as well as ancillary revenue (such as mortgage, title, and escrow). All of these harms, and any others caused by REcolorado’s illegal rules, must be paid back in triplicate and the illegal rules must be enjoined.

## NATURE OF THE CASE

9. This lawsuit challenges the unlawful conduct of an MLS. MLSs are not pro-consumer, pro-competitive institutions; they are combinations of competing brokers and agents that make rules governing competition among them.[6] As such, MLS rules have long been regarded warily by courts and antitrust enforcers. When a group of competitors like an MLS "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[7] As the FTC observed, the people who control the MLS "control . . . the most important aspects of brokerage practices."[8] That control has been used in the past to do things like fix commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

10. In the 1940s, the U.S. Department of Justice ("DOJ") brought civil and criminal charges against MLSs that fixed commission rates.[9] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[10] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that

---

[6] Except where applicable law or regulations would require otherwise, the terms "agent" and "broker" are used interchangeably throughout this complaint.

[7] *United States v. Realty Multi-List, Inc*., 629 F.2d 1351, 1370 (5th Cir. 1980).

[8] Butters Report at 15.

[9] *See United States v. Nat'l Ass'n of Real Est. Bds*., 339 U.S. 485, 487 (1950).

[10] *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 819 (6th Cir. 2011).

directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[11]

11. REcolorado is Colorado's largest MLS, with approximately 25,000 real estate professional subscribers—competing brokers and agents—covering the Denver metropolitan area and surrounding regions.[12] REcolorado's rules are agreed to by those competitors: a broker becomes eligible to participate in REcolorado only by agreeing in writing to conform to REcolorado's rules, and every subscriber must follow them as a term of subscribership.[13]

12. For decades, REcolorado has been an unavoidable and dominant feature of residential real estate brokerage. Participation in REcolorado is essential for any real estate agent to work in many areas of Colorado; real estate agents cannot effectively represent clients in those areas without being members of REcolorado subject to its rules. While many homeowners are well served by pre-MLS or off-MLS marketing strategies, the importance of the MLS means it is still essential for agents to belong to the MLS in the area where they work. Thus, agents cannot survive in business without participating in the MLS.

13. Showing REcolorado's incredible market power, agents must follow REcolorado's rules or REcolorado will fine and punish them, potentially by exclusion from REcolorado.

---

[11] *United States v. Consol. Multiple Listing Serv., Inc.*, No. 3:08-cv-01786-SB, 2009 WL 3150388, at *2 (D.S.C. Aug. 27, 2009).

[12] *About*, REcolorado, https://recolorado.com/about/; First Am. Compl. ¶ 35, *Ariz. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-09253-MKV (S.D.N.Y. Oct. 30, 2026), ECF No. 28 ("ARMLS Am. Compl.").

[13] MLS Policy, Glossary (defining "Participant"), § 1.28.

REcolorado polices its members through a Data Accuracy Department that monitors listing content and investigates how its members (who are competitors) represent their clients. REcolorado encourages competing agents to report to REcolorado any rule violations by their competitors for punishment—including through a reporting button dedicated to its public-marketing rule—and it will process those complaints without revealing the complainant's identity.[14] While the MLS is one of the rare private companies that fines and punishes its own customers, agents accept this because REcolorado membership is critical to their business and because it blunts competition they might otherwise face without the MLS rules.

14. The Anticompetitive Rules specifically block competition among brokers and agents, and homeowner choice. Section 1.0 forces homeowners, brokers, and agents to give REcolorado their listings and forces them into all of the REcolorado restrictions: every property listed under an exclusive right-to-sell or exclusive agency agreement must be submitted to REcolorado within three business days, either as an MLS listing or, at the seller's request, as a "Private Exclusive." One of those restrictions, in Section 1.0 and Appendix A, dictates how a homeowner can publicly market their property. Unless they give the listing to REcolorado as a fully distributed MLS listing within one day—which, under Appendix A, includes every day of the week and holidays—homeowners and agents may not market the property to the public, which Appendix A defines to include "distributing flyers, yard signs, digital communications (i.e., email

---

[14] *Use 'ReportIt' to Let Us Know About Potential Listing Errors and MLS Rule Violations,* REcolorado (June 7, 2022), https://recolorado.com/reportit/; *see also* MLS Policy at 4 (Data Accuracy Department "researches the details of alleged violations [and] monitors listing content"); *id.* § 8.1 ("All complaints will remain anonymous.").

blasts), multi-brokerage listing sharing networks, social media, applications available to the general public, [and] digital marketing on public-facing websites," including IDX and VOW displays, and syndication portals. And under Sections 1.0 and 1.02, a homeowner may withhold a listing from full distribution in REcolorado only by designating it a "Private Exclusive," which may not be publicly marketed at all. Even though REcolorado does not own the home or represent the homeowner, REcolorado is dictating how the homeowner and their agent must sell the home.

15. The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS and marketed how REcolorado directs. Through these rules, REcolorado and its co-conspirators control how homeowners and agents market properties on REcolorado and outside REcolorado. REcolorado and its co-conspirators, thus, control home marketing across the entire real estate industry in much of the Denver metropolitan area and surrounding regions.

16. These rules stand directly in the way of competition. Compass has invested hundreds of millions of dollars in developing technology, competition with other brokerages for agents and clients, and innovative marketing strategies. If a homeowner chooses phased marketing, it proceeds in three phases. In the first phase, the homeowner chooses to publicly market the property via channels outside of the MLS, such as select internet websites, social media, newsletters, yard signs, word of mouth, or other techniques. Homebuyers do not need to work with a Compass agent to view these listings, and agents at other brokerages can view these listings on request. In the second phase, the listing is displayed on the Compass and Redfin websites as a "Coming Soon," and other agents can learn about the property from the MLS. In the third phase, the listing is published by the MLS to tens of thousands of websites and other data recipients.

17. The phased marketing strategy has several advantages for homeowners. MLSs append to the listing (which is the ***homeowner's*** sales pitch to buyers) the history of price changes and days on market, which are perceived by buyers as signaling homeowner desperation. Having price changes and days on market in the homeowner's own advertisement often prevents homeowners from obtaining the full value of their property. This is unique to residential real estate: sellers of other goods are not forced to include, in their advertisements, price changes or how long the good has been for sale. By testing an aspirational price in a pre-MLS phase, homeowners may avoid the harms of unnecessary price cuts or days on the market being added by the MLS to the listing. Phased marketing also offers the chance to sell a house without the inconvenience and loss of choice that comes with listing it for sale through the MLS. In sum, phased marketing is good for some homeowners, good for agents seeking to represent those homeowners, and good for Compass. It does, however, threaten incumbents (that comprise REcolorado and have agreed to its rules) by forcing them to compete with Compass for homeowner clients, and to compete with Compass for agents who want a brokerage with innovative marketing strategies and choices they can offer to their clients.

18. REcolorado's rules offer "Coming Soon" and "Private Exclusive" options, but neither gives homeowners the benefits of phased marketing. Phase One is blocked by REcolorado rules, and Phase Two is severely restricted: Phase One listings cannot be publicly marketed, and REcolorado's Coming Soon listings must first be entered into REcolorado and have severe restrictions on what the homeowner and agent can do. Specifically, REcolorado states that even if the homeowner wants their agent to show buyers the property, showings are not allowed while a

listing is in Coming Soon status.[15] REcolorado states that all Coming Soons must be restricted to seven days, even if the homeowner wants their home listed as a Coming Soon for longer.[16]

19. The Anticompetitive Rules unreasonably restrain trade in two ways. REcolorado's agent members compete directly with one another and with Compass' agents for homeowners, and the Anticompetitive Rules block competition from brokers and agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported, "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[17] Moreover, REcolorado is blocking competition between competing brokerages (the firms with which agents affiliate) to attract agents with innovative marketing strategies to win more clients.

20. A long history of antitrust enforcement shows why the Anticompetitive Rules violate the law. As recognized by the FTC, to comply with the antitrust laws, an MLS must give real estate brokers, agents, and homeowners true alternatives to the MLS—alternatives that existed for over 50 years.[18] For example, the "Fourteen Points" antitrust policy adopted in 1971 by the National Association of REALTORS® ("NAR")—whose Clear Cooperation Policy REcolorado adopted and enforces, and whose procedures govern REcolorado's hearings[19]—expressly provides

---

[15] MLS Policy §§ 1.0, 1.3, 3.1.

[16] MLS Policy, Glossary (defining "Coming Soon").

[17] Butters Report at 130.

[18] *Id.* at 129–30.

[19] REcolorado is not affiliated with NAR. ARMLS Am. Compl. ¶ 41. But REcolorado adopted its public-marketing restriction as its implementation of NAR's Clear Cooperation Policy, describes

that an "***MLS shall not: Make any rule regulating the advertising or promotion of any listing***,"[20] and preserves an alternative to the MLS, which it calls an "office exclusive."[21] Before REcolorado adopted its version of NAR's Clear Cooperation Policy in 2020, on information and belief, REcolorado placed no restrictions on how listings kept out of the MLS were publicly marketed. REcolorado's rules stated that "[t]he MLS does not regulate the type of listings its Participants may take," and permitted a seller simply to direct, in the listing contract, that "he or she does not want the listing submitted to the MLS."[22] REcolorado's rules even expressly contemplated that a listing broker would "place[] a for sale sign on a property without submitting the listing to the MLS"—in which case REcolorado's only role was to request the listing contract "to verify that it was memorialized" that the seller did not want the listing in the MLS.[23]

21. The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings [like REcolorado's Section 1.0]. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free

---

that policy as NAR's, conducts hearings under the procedures of NAR's Code of Ethics and Arbitration Manual, and participated in NAR's class-action settlement. *See* MLS Policy §§ 1.4, 8.3(3); *Use 'ReportIt' to Let Us Know About Potential Listing Errors and MLS Rule Violations*, REcolorado (June 7, 2022), https://recolorado.com/reportit/.

[20] Butters Report at 134 n.354 (emphasis added).

[21] *Id.* ("MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'").

[22] 2017 Rules §§ 1.0, 1.4.1, at 7.

[23] 2017 Rules § 3.1, at 13.

to contract as they see fit."[24] The Anticompetitive Rules are contrary to the Fourteen Points antitrust policy and cause the exact competitive injury about which the FTC warned. The DOJ commented on a policy similar to REcolorado's Appendix A that the "[p]olicy restrict[ed] home-seller choices and preclude[d] competition from new listing services."[25] The DOJ's comment echoed the FTC's 1983 conclusion that "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[26]

22. In short, under federal and state law, brokers and agents are entitled to offer, and consumers are entitled to choose from, more than the limited options that the actions of REcolorado's combination of competitors have forced upon the industry. But REcolorado blocks that choice and the competition that choice would bring.

23. REcolorado and its co-conspirators have harmed brokers and agents, including Compass and its agents, and homeowners. Compass is blocked from winning clients, from attracting agents, and from receiving commissions and other benefits that would come from its competition through innovative marketing strategies. Homeowners are hurt because they (1) cannot sell their own properties however they legally want, including in ways that test the market, and manage the sales process; (2) cannot benefit from marketing strategies that, on average, provide them with a 4.6% higher sale price, 34% fewer days on the MLS, and 29% fewer

---

[24] Butters Report at 130.

[25] *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 954 (D.C. Cir. 2024) (discussing DOJ investigations).

[26] Butters Report at 130.

price cuts; and (3) cannot benefit from the fiduciary duties agents owe to their clients, including a seller's agent's duty under Colorado law to promote the seller's interests with the utmost good faith, loyalty, and fidelity, and every listing broker's duty to exercise reasonable skill and care for the seller.[27]

24. REcolorado has no valid justifications for its illegal conduct. Any claim REcolorado makes is undermined by recent history: on information and belief, until 2020, REcolorado allowed agents and their clients to market pre- and off-MLS without fines, REcolorado succeeded, and homes were legally sold throughout the Denver metropolitan area and surrounding regions. Moreover, MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed, and homes are still sold legally. REcolorado's restraints on competition are not about "transparency."[28] REcolorado does not allow homeowners or homebuyers to become members or to directly search or access its database.[29] REcolorado accepts listings only from licensed brokers under a listing agreement—not from homeowners selling their own homes.[30] Moreover, REcolorado's own rules allow listings to

---

[27] Colo. Rev. Stat. §§ 12-10-404(1)(b)–(c).

[28] *See* ARMLS Am. Compl. ¶ 77 (asserting that the Cooperation Rules promote "Market Transparency and Information Quality").

[29] MLS Policy § 3.0, at 17 ("Any listing filed with the MLS may not be made available to any non-Subscriber without the prior consent of the Participant."); *id.* § 9.0, at 25 (MLS information "will be considered confidential and is exclusively for the use of Subscribers"); *id.*, Glossary, at 60, 63 (defining "Participant" and "User," and providing that "under no circumstances is any individual or firm . . . entitled to MLS subscribership or participation unless they hold a current, valid real estate broker's license or are licensed or certified . . . to engage in the appraisal of real property").

[30] MLS Policy § 1.0, at 5 (requiring submission of properties "listed under an Exclusive Right to Sell or Exclusive Agency agreement"); *id.*, Glossary, at 60 (defining "Participant").

be hidden from other brokers, as "Private Exclusives," just as long as they are not publicly marketed outside of REcolorado.[31] Its restraints also have nothing to do with "free-riding." The free-riding justification was rejected by a federal appellate court in nearly identical circumstances.[32] Compass also gets nothing for free: Compass is a significant contributor of listings to REcolorado. Even when homeowners publicly market their properties pre-MLS, most would still instruct Compass to give their listings to the MLS before they sell (over 93% of all Compass listings, including listings publicly marketed pre- and off-MLS, are sold after being submitted to the local MLS). On the other hand, REcolorado gives listings to third-party portals and other companies that do not contribute any listings.[33]

25. Compass hereby brings claims against REcolorado for violating the Sherman Act, 15 U.S.C. § 1.

## PARTIES

26. Plaintiff Compass, Inc. is a Delaware corporation with its principal place of business in New York, New York. Compass, Inc. is an innovative, national real estate technology company and brokerage that provides a proprietary, end-to-end cloud-based platform for agents and their clients. Under the brand names "@properties," "Ansley Real Estate," "Better Homes &

---

[31] MLS Policy §§ 1.0, 1.02, 1.5, 3.0, 9.0; *id.*, Glossary (defining "Participant").

[32] *Realcomp II, Ltd.*, 635 F.3d at 835.

[33] *See* MLS Policy §§ 14.0–14.3; *id.* App. C (referring to "REcolorado's sites (including recolorado.com) or syndicated real estate listings"); *REcolorado and REdistribute: Powering Housing Data Research*, REcolorado (Nov. 10, 2022), https://recolorado.com/recolorado-and-redistribute-powering-housing-data-research/; More Listing Visibility Through Google Home Search, REcolorado (July 22, 2026), https://recolorado.com/more-listing-visibility-through-google-home-search/.

Gardens Real Estate," "Century 21," "Christie's International Real Estate," "Coldwell Banker," "Compass," "Corcoran," "ERA," "Latter & Blum," "Sotheby's International Realty," and "Washington Fine Properties," Compass operates brokerages and licenses franchises throughout the United States, including Colorado. Compass empowers thousands of agents with cutting-edge technology to better serve homebuyers and homeowners. Compass also has title & escrow and mortgage joint-venture operations across the United States, including Colorado.

27. Plaintiff Compass Colorado, LLC is a Delaware limited liability company that is licensed to, and does, operate as a real estate brokerage in Colorado. Its regional headquarters is located at 200 Columbine Street, Suite 500, Denver, Colorado 80206. Compass Colorado, LLC is an indirect wholly owned subsidiary of Compass, Inc.

28. Compass Colorado, LLC participates in REcolorado through its employing broker, Stephanie Kay Knight, who executed REcolorado's current participation agreement on its behalf for its main office (REcolorado Office ID CCLLC) and its Denver, Boulder, and Breckenridge offices; is the party to the listing agreements with homeowners in the REcolorado service area; and is the entity against which REcolorado enforces its rules.

29. Defendant Metrolist, Inc., d/b/a REcolorado, is a Colorado corporation with its principal place of business at 6455 South Yosemite Street, Suite 300, Greenwood Village, Colorado 80111. Since September 27, 2024, REcolorado has been owned by MAZL, LLC ("MAZL"), a private company formed to acquire REcolorado.[34] Before then, REcolorado was

---

[34] *MAZL, LLC Completes Acquisition of REcolorado*, REcolorado (Sept. 27, 2024), https://recolorado.com/mazl-llc-completes-acquisition-of-recolorado/.

owned by two associations of REALTORS®: the Denver Metro Association of REALTORS® ("DMAR") and the South Metro Denver REALTOR® Association ("SMDRA").[35] REcolorado has approximately 25,000 subscribers, and "subscribers of several other MLSs can access its platform through IntraMatrix."[36]

30. REcolorado is a contract, combination, or conspiracy of competing agents and brokers. REcolorado's participating brokers and agents compete directly with one another and with Plaintiffs for homeowner clients, homebuyer clients, and agents. Those brokers and agents have agreed in writing to follow REcolorado's rules, they follow and enforce those rules, and they report one another to REcolorado for violating them.[37]

31. Sections 1.21 and 1.22 of REcolorado's MLS Policy define the area REcolorado covers by reference to the service areas of four associations of REALTORS®: DMAR, SMDRA, the Mountain Metro Association of REALTORS®, and REALTORS® of Central Colorado. Every Participant's listing of the covered property types located in those areas must be submitted to REcolorado.[38] Those areas include: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Chaffee, Clear Creek, Conejos, Costilla, Custer, Denver, Douglas, Elbert, Fremont, Gilpin, Jefferson, Lake, Mineral, Park, Rio Grande, and Saguache counties.[39] Moreover, REcolorado is the only MLS in

---

[35] *See id.*; *see also* MLS Policy Glossary (still defining "REcolorado®, Inc." as owned by DMAR and SMDRA).

[36] ARMLS Am. Compl. ¶ 35.

[37] *See* MLS Policy §§ 1.28, 8.1, Glossary (defining "Participant").

[38] MLS Policy §§ 1.21–1.22.

[39] *See* DMAR, Board of Directors Governing Policy Manual, 2.10 (last revised May 19, 2023), *available at* https://www.dmarealtors.com/sites/default/files/file/2023-11/Final%20Policy%20Manual%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.pdf; *Housing Market Statistics*, SMDRA,

the Denver metropolitan area. Although REcolorado exchanges listings with IRES, the MLS serving some surrounding areas, IRES enforces a similar public-marketing rule.

**DEFENDANT'S CO-CONSPIRATORS**

32. Competing brokers and agents, including the Participants and Subscribers who have agreed in writing to REcolorado's rules, those who report their competitors' violations to REcolorado, and members of REcolorado's MLS Policy Council, conspired with each other and with REcolorado to design, approve, enforce, and implement the Anticompetitive Rules. Through September 27, 2024, REcolorado's then-owners, DMAR and SMDRA, also conspired with REcolorado and its Participants to adopt and enforce those rules. REcolorado adopted its public-marketing restriction in 2020 through its Rules and Regulations Committee, which recommends new rules, and its Board of Directors, which reviews them; most members of both bodies were affiliated with real estate brokerages, and many held seats on behalf of associations of REALTORS®.[40] In June 2024, DMAR and SMDRA, as REcolorado's sole shareholders, removed REcolorado's entire Board and replaced it with a transitional board composed of the two associations' chief executives and past presidents, and DMAR stated publicly that it was selling

---

https://smdra.com/resources/general/housing-market-statistics/; Mountain Metro Association of Realtors Bylaws, art. III § 1 (2025), *available at* https://www.mountainmetro.com/sei_pdfs/2025_mmar_bylaws_(revised_3.2025).pdf; *Market Stats*, Realtors of Central Colo., https://rocc.realtor/market-stats/.

[40] *See* REcolorado, 2020–2021 Annual Report at 17–18, *available at* https://cdn.recolorado.com/files/reports/REcolorado+Annual+Report+2020-21.pdf; *Clear Cooperation and REcolorado*, REcolorado, https://cdn.recolorado.com/files/helpcenter/Clear-Cooperation.pdf; *see* 2017 Rules at 4 (Committee "makes recommendations for new rules," which are "submitted to the Board of Directors for review").

REcolorado in part to protect it from ongoing antitrust litigation.[41] REcolorado's MLS Policy, as most recently re-adopted in April 2026, still describes REcolorado as owned by DMAR and SMDRA and still defines REcolorado's coverage by reference to the associations' service areas.[42] The membership of the MLS Policy Council, which amends REcolorado's rules and hears appeals of fines, is not publicly disclosed.

33. REcolorado's co-conspirators performed acts and made statements in furtherance of REcolorado's anticompetitive conduct. REcolorado is jointly and severally liable for the acts of its co-conspirators, whether or not they are named as defendants in this complaint.

**JURISDICTION AND VENUE**

34. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Compass brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking injunctive relief, damages, treble damages, cost of suit, and reasonable attorneys' fees, arising from REcolorado's and unnamed co-conspirators' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

35. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

36. This Court has personal jurisdiction over REcolorado because its headquarters and principal place of business are in this district, and REcolorado conducts substantial business in this district.

---

[41] *Proposed Sale of REcolorado FAQs*, DMAR (July 7, 2024), https://www.dmarealtors.com/news/proposed-sale-recolorado-faqs.

[42] MLS Policy §§ 1.21–1.22, Glossary (defining "REcolorado®, Inc.").

37. Venue is appropriate in this district because REcolorado's headquarters and principal place of business are in this district and because a substantial portion of the transactions and events giving rise to this action—the agreement among the competing brokerages and the actual and threatened enforcement of anticompetitive rules—occurred in this district. 28 U.S.C. § 1391; 15 U.S.C. § 22. REcolorado was organized as a Colorado corporation in 1984 and lists its principal office in this district in its filings with the Colorado Secretary of State.

**TRADE AND COMMERCE**

38. REcolorado has entered into agreements with each of its approximately 25,000 subscribers and facilitates the sale of tens of thousands of residential homes and condominiums, with total closings valued in the billions of dollars.[43] In 2025, REcolorado's database included more than 116,000 listings.[44] These transactions, together with the associated mortgage financing, out-of-state buyers and homeowners, and national title insurance, are in and have a substantial effect on interstate commerce, as used in 15 U.S.C. § 1.

---

[43] ARMLS Am. Compl. ¶ 35; Denver Metro Ass'n of Realtors®, *DMAR Market Trends: December 2025*, at 3, 14–15 (Jan. 2026), https://www.dmarealtors.com/sites/default/files/file/2026-01/DMAR_MarketTrendsReport_December2025Data.pdf (reporting REcolorado data: 5,567 sales at $1 million or more, at an average of $1.64 million; 6,656 sales at $750,000–$999,999; and 16,583 sales at $500,000–$749,999); *see also* REcolorado, *Denver Metro Market Watch: December 2025*, https://cdn.recolorado.com/files/market-watch/2025/REcolorado-Market-Watch-2025-12.pdf (December 2025 gross sales volume of approximately $2.06 billion).

[44] ARMLS Am. Compl. ¶ 35.

## RELEVANT MARKETS

39. Relevant Product Markets. There are at least three relevant product markets: (1) provision of real estate brokerage services to homeowners (the "Brokerage Services Market"); (2) provision of real estate brokerage services to agents who represent homeowners (the "Agent Services Market"); and (3) provision of multiple listing services to brokers and agents who represent homeowners (the "MLS Market") (collectively, the "Relevant Markets").

40. The Brokerage Services Market includes the services that brokerages and agents provide their homeowner clients. Those services include, among other things, advising on pricing and marketing, conducting marketing activities, and negotiating with buyers. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of brokerage services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages and agents who participate in and control REcolorado compete in the Brokerage Services Market.

41. The Agent Services Market consists of services that brokerages provide to agents. Those services include, among other things, sharing commissions with the agent, developing and maintaining a strong brand that appeals to consumers, investing in and providing technology agents can use in representing clients, and supporting agents in representing their clients, including by offering innovative and appealing ways to better serve their clients. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of agent services likely would undertake at least a small but

significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages who participate in and control REcolorado compete in the Agent Services Market.

42. The MLS Market consists of the services that MLSs provide to brokers and agents. Those services include a repository of property listings, distribution of listings to other agents, and syndication of those listings through data sharing feeds to other participants, including the other real estate brokers and agents in the area and the large public-facing aggregator websites such as third-party portals. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of multiple listing services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. REcolorado participates in the MLS Market.

43. Relevant Geographic Market. The relevant geographic market for each of the defined product markets is no larger than REcolorado's service area, as defined by Sections 1.21 and 1.22 of its MLS Policy (the "REcolorado service area"). A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of each of the relevant products in this geographic market likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Brokers and agents cannot avoid REcolorado's rules by using a neighboring MLS or an MLS with a data sharing agreement with REcolorado for at least two reasons:

(a) Brokers and agents need to be members of the MLS that covers their region because being an "out-of-region" broker or agent makes it harder to attract clients and agents.

(b) REcolorado rules apply to all agents and listings affiliated with a "Participant," which means that every listing of the covered property types in the REcolorado service area by an agent affiliated with a participating brokerage must be given to REcolorado, even if the homeowner does not want it disseminated through REcolorado.[45] And once a brokerage whose office is in that area chooses to participate, every licensee and administrative assistant under its supervision must also participate unless they subscribe to another MLS.[46] Specifically, each Participant is responsible and accountable for every affiliated User's compliance with the MLS Policy and payment of sanctions; all of a Participant's listings of the covered property types in the REcolorado service area must be submitted to REcolorado; every licensee and administrative assistant under the supervision of a Participant whose office is in that area must participate in REcolorado unless they subscribe to another MLS; and fees are assessed for each of them.[47] Thus, if one agent in a brokerage needs REcolorado access, then all agents in that brokerage are bound by REcolorado's rules.

44. To serve their clients and compete in the REcolorado service area, brokers and agents must have access to REcolorado and follow REcolorado's rules. Thus, in both the Brokerage Services Market and the Agent Services Market, the brokers and agents that combine

---

[45] MLS Policy §§ 1.5, 1.22, 1.28, 8.0.

[46] MLS Policy § 1.21.

[47] MLS Policy §§ 1.21, 1.22, 1.28, 7.0, 8.0.

to adopt, follow, and enforce the REcolorado rules collectively have market power. In the MLS Market, REcolorado has market power.

45. As the DOJ has alleged, "By virtue of industry-wide participation and control over a critically important input, the MLS (a joint venture of competing brokers) has market power in almost every relevant market."[48] And, as the DOJ and FTC reported, "[a]s the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers. . . . MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."[49]

## FACTUAL ALLEGATIONS

***MLSs and the Antitrust Laws***

46. An MLS aggregates listings submitted by participating agents into a common database and makes the resulting data available to MLS participants and subscribers. REcolorado is in the business of operating a broker cooperative by:

(a) providing a facility for the orderly correlation and dissemination of listing information;

(b) providing a means of enhancing cooperation among brokers;

---

[48] Am. Compl. ¶ 24, *United States v. Nat'l Ass'n of Realtors*, No. 05-C-5140 (N.D. Ill. Oct. 4, 2005), reprinted in 73 Fed. Reg. 36104, 36105 (June 25, 2008).

[49] DOJ & FTC, Competition in the Real Estate Brokerage Industry 12 (Apr. 2007) ("2007 DOJ/FTC Report"), available at https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.

(c) accumulating and disseminating information that Participants use to prepare appraisals, analyses, and other valuations of real property; and

(d) providing a means by which Participants engaged in appraisal contribute to common databases.[50]

47. MLSs also make and enforce rules. REcolorado explains how competing agents can help enforce REcolorado's rules, and it provides a specific process to report violations of the Anticompetitive Rules: a "ReportIt: Clear Cooperation Policy" button on each subscriber's dashboard, which asks for the listing address, the broker's name or office, a description and date of the violation, and supporting screenshots or photographs.[51]

48. In addition to operating this members-only database, some MLSs, like REcolorado, license agent and homeowner data to third parties, such as real estate web portals and technology vendors, which monetize it in various ways, *e.g.*, selling leads for potential buyers to agents by displaying the data on websites with advertising alongside, and by creating tools to recruit agents from brokerages.[52] REcolorado, for example, holds an equity stake in REdistribute, a joint venture that aggregates listing data from REcolorado and other MLSs; by REcolorado's own description, that data "will be sold to large entities like the US government and banking institutions," including

---

[50] MLS Policy, Glossary (defining "Multiple Listing Service (MLS)"); *id.* §§ 14.0–14.3.

[51] *Use 'ReportIt' to Let Us Know About Potential Listing Errors and MLS Rule Violations,* REcolorado (June 7, 2022), https://recolorado.com/reportit/; *see also* MLS Policy § 8.1.

[52] *See* REcolorado, Multiple Listing Service Participation Agreement § 4.2 (rev. Feb. 6, 2025) ("Participation Agreement") (REcolorado "may use and license . . . the MLS Database . . . to any third party including, without limitation, . . . Brokerage Firms, brokerage back office system Vendors, and IDX Vendors, for any lawful purpose reasonably deemed appropriate by REcolorado"); *Data Delivery – Bridge*, REcolorado, https://recolorado.com/data/; MLS Policy §§ 14.0–14.3.

"for use in valuation models, [automated valuation model]s, and other related purposes," with the revenue "shared back" to participating MLSs.[53] And as of July 2026, REcolorado sends its listing data to HouseCanary, which formats and delivers it for display in Google search results.[54]

49. Brokerages that have adopted the traditional, mutually aligned business model of real estate sales rely passively on one another to provide their listings to each other via the MLS. MLSs that are comprised of or governed by brokerages and agents with traditional business models have a strong financial incentive to impair the business models of innovators and mavericks who seek to offer marketing options to homeowners that eschew immediate and automatic sharing of their listings on the MLS regardless of the circumstances or preferences of the homeowner. Such MLSs, and the traditional brokerages and agents that control them, try to prevent their members from publicly marketing properties off-MLS, because publicly marketing off-MLS presents a competitive challenge to the traditional brokerages.

50. MLSs are private companies. Unlike agents, MLSs do not owe fiduciary duties to anyone, let alone consumers. They are not government entities or law enforcement agencies, even though they pretend to have similar powers when interacting with agents. MLSs are not inherently pro-consumer, pro-competitive institutions; they are organizations of competing agents that make

---

[53] *REcolorado and REdistribute: Powering Housing Data Research*, REcolorado (Nov. 10, 2022), https://recolorado.com/recolorado-and-redistribute-powering-housing-data-research; Press Release, REcolorado, REdistribute Announces BeachesMLS, REcolorado® and Stellar MLS as Initial Lead Investors (Nov. 8, 2022), https://recolorado.com/redistribute-initial-investors/ (REcolorado "is proud to be joining REdistribute as an ownership partner.").

[54] *More Listing Visibility Through Google Home Search*, REcolorado (July 22, 2026), https://recolorado.com/more-listing-visibility-through-google-home-search/ ("REcolorado sends listing data to HouseCanary, which formats and delivers the data . . . to Google's Home Discovery Program.").

rules governing competition among them. They enforce those rules by fining and punishing their members.

51. As such, MLSs and their rules have long been regarded warily by courts and antitrust enforcers. When competitors "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[55] As the FTC wrote, control over the MLSs gives "Realtor groups the single most powerful tool available for shaping brokerage practice."[56] That control has been used in the past to do things like fix commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

52. In the 1940s, the DOJ brought civil and criminal charges against MLSs that fixed commission rates.[57] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[58] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or

---

[55] *Realty Multi-List*, 629 F.2d at 1370.

[56] Butters Report at 92–93.

[57] *See Nat'l Ass'n of Real Est. Bds.*, 339 U.S. at 487.

[58] *Realcomp II, Ltd.*, 635 F.3d at 819.

discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[59]

53. Recognizing the pro-competitive benefits of pre-MLS marketing strategies is consistent with the federal antitrust agencies' long-standing views of the real estate markets. "[T]he Agencies . . . have challenged, as antitrust violations, MLS rules that unreasonably restrict competition by brokers who use alternative business models."[60] For example, the DOJ and FTC have brought cases ensuring that discount brokers and fee-for-service brokers were not denied MLS access.[61]

54. This history is long-standing and specific. On behalf of all its affiliated MLSs, NAR addressed this antitrust problem in 1971. As the FTC explained:

> By the late 1960's and early 1970's, MLSs had been named in a number of private antitrust actions and Justice Department investigations. Justice Department investigations culminated in 15 consent orders banning price fixing and other alleged anti-competitive activities. In response to these legal problems, the National Association of Realtors developed and enforced a list of policy points.[62]

55. NAR's November 15, 1971, statement, setting out and mandating these policies on the Realtor MLSs, is referred to in the industry as the "Fourteen Points" antitrust policy. Point 11 of the policy specifically addressed the antitrust problem caused by mandatory submission rules by guaranteeing an alternative method of selling residential properties to the MLS: the "office

---

[59] *Consol. Multiple Listing Serv., Inc.*, 2009 WL 3150388, at *2.

[60] 2007 DOJ/FTC Report at 63; *see also Realty Multi-List*, 629 F.2d 1351; *Realcomp II*, 635 F.3d 815.

[61] 2007 DOJ/FTC Report at 64 (describing and citing cases).

[62] Butters Report at 109.

exclusive."[63] Specifically, the antitrust policy expressly provided that "***MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'***"[64] Point 10 provided that "***MLS shall not: Make any rule regulating the advertising or promotion of any listing.***"[65] The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[66] The term "office exclusive" just meant the listing was not provided to the MLS, and before REcolorado adopted its public-marketing restriction, a homeowner could market the home however she wanted. Therefore, REcolorado's mandatory submission rules cannot possibly comply with the antitrust laws because agents and homeowners have no freedom to avoid REcolorado's restrictions or market their homes how they choose under the Anticompetitive Rules.

***The Anticompetitive Rules***

56. REcolorado's rules are agreed to by each of its Participants, who are working brokers, and are enforced by REcolorado and by those Participants. Amendments to the MLS Policy are made by REcolorado's MLS Policy Council, whose membership REcolorado does not

---

[63] *Id*. at 130.

[64] *Id*. at 134 n.354 (emphasis added).

[65] *Id*. (emphasis added).

[66] *Id*. at 130.

publicly disclose.[67] REcolorado first adopted its public-marketing restriction in 2020, as its implementation of NAR's Clear Cooperation Policy, through its Rules and Regulations Committee and a Board of Directors composed of working brokers. REcolorado's Data Integrity Team administratively imposes fines; a Subscriber may seek review of a fine by REcolorado's Fine Waiver Appeal Team and then by the MLS Policy Council, which also decides repeat violations and requests for hearings.[68]

57. The restraint is the agreement itself. The Anticompetitive Rules do not merely make it possible for competitors to punish public marketing. By their own terms, they prohibit every Participant and Subscriber from following a homeowner's instruction to publicly market a listing that has not been submitted to REcolorado for full distribution within one day, and they penalize any who do. Each Participant agrees in writing to conform to those rules as the condition of access to REcolorado, and the Participants enforce them against one another by reporting violations. Excluding pre- and off-MLS public marketing is not a possible side effect of the rules; it is what the rules require.

58. Section 1.0 provides that every property listed under an exclusive right-to-sell or exclusive agency agreement must be submitted to REcolorado within three business days of obtaining the required signatures or the beginning of the listing period, whichever comes first, either as an MLS listing or, at the seller's request, as a Private Exclusive. Section 1.0 and Appendix A dictate how homeowners can publicly market their properties. Unless they give the listing to

---

[67] MLS Policy § 13.0.

[68] MLS Policy §§ 8.0–8.3.

REcolorado as a fully distributed MLS listing within one day of the marketing activity—with a "day" that includes every day of the week and holidays—agents and homeowners may not market the property to the public, which Appendix A defines to include "distributing flyers, yard signs, digital communications (i.e., email blasts), multi-brokerage listing sharing networks, social media, applications available to the general public, [and] digital marketing on public-facing websites," including IDX and VOW displays and syndication portals. Under Section 1.02, a Private Exclusive may be marketed only "privately" and "on a one-to-one basis"; "[p]ublic marketing is not allowed and if it occurs the listing will need to be available and distributed in the full MLS." Under Appendix A, removing the marketing does not cure the violation.[69] The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS.

59. If a REcolorado Participant violates REcolorado's rules, REcolorado can punish the real estate agent and/or brokerage by levying fines or blocking their access to the listings database.[70] Under Section 1.0 of REcolorado's MLS Policy, a failure to enter a publicly marketed listing into REcolorado within one day draws a written warning for the first violation, a $100 fine for the second, a $250 fine for the third, and, for the fourth, referral to the MLS Policy Council for further action.[71] REcolorado's Data Integrity Team imposes these sanctions administratively, without a mandatory prior hearing, and a sanctioned Subscriber must comply with REcolorado's

---

[69] MLS Policy § 1.02; *id.* Appendix A ("Note: Removing the marketing activity does not cure the violation.").

[70] MLS Policy § 8.1.

[71] MLS Policy § 1.0.

decision while seeking review, first by REcolorado's Fine Waiver Appeal Team and then by the MLS Policy Council.[72] REcolorado treats a homeowner's decision to publicly market a home without entering it as an MLS listing within one day as a failure to timely enter the listing, subject to the same escalating sanctions, and removing the marketing does not cure the violation.[73] REcolorado MLS Policy Section 8.1 also gives REcolorado discretion to impose fines of up to $15,000, probation, and suspension or termination of MLS rights with no right to reapply for up to three years, and requires multiple repeat violations to be referred to the MLS Policy Council. REcolorado polices its rules, as do REcolorado's members.

***See It First™ on Compass***

60. A homeowner may decide to submit a property listing immediately to the MLS for distribution. Alternatively, a homeowner may decide to engage in one or more public marketing strategies that precede distribution through the MLS. These pre- and off-MLS strategies may take a number of different forms. "Office exclusives" are a long-standing practice of publicly marketing a property off the MLS. Another alternative is a "Coming Soon" listing, where a listing is available to other participants in the MLS and may be posted to an agent's website or to other selected websites.

61. Compass is an innovative, technology-forward real estate brokerage. From its founding in 2012, Compass has invested in and developed pre- and off-MLS marketing strategies. These marketing strategies allow homeowners to choose effective options to meet their goals.

---

[72] MLS Policy §§ 8.1, 8.2.

[73] MLS Policy § 1.0, Appendix A.

Today, Compass refers to these strategies under its "See It First™ on Compass" umbrella; a prior version was called Compass' 3-Phased Marketing Strategy. Compass agents offer See It First™ on Compass to clients everywhere, although REcolorado impedes that competition to protect its members, who are Compass' competition.

62. Compass agents always discuss the advantages and disadvantages of immediate MLS distribution and phased marketing with the homeowner. The homeowner decides what to do. When working with a Compass agent, a homeowner who opts to use See It First™ on Compass as a strategy signs disclosures[74] acknowledging that the listing will not initially appear in the active MLS feed.

63. In the first phase of See It First™ on Compass, agents do not list the property on the MLS but publicly market listings in every off-MLS way allowed by local MLS rules, including informing viewers on Compass' website that (unspecified) off-MLS listings exist in the area in which the user is searching. A prospective buyer need not hire a Compass agent, or any agent, to learn about or obtain access to these listings. A buyer may contact a Compass office directly, ask a non-Compass agent to contact Compass, or register on their own without charge. Agents at other brokerages also can view these listings on request.

64. In the second phase of See It First™ on Compass, the listing moves to a "Coming Soon" status. If the homeowner instructs the agent to do so, Compass advertises "Coming Soon" listings on its own website and also distributes them to Redfin.com, a third-party real estate site, which combined have over 50 million monthly active users. Coming Soon status signals to

[74] These disclosures are available at https://www.compass-homeowners.com.

prospective buyers that the property will soon become active on the MLS and allows the homeowner to gather valuable feedback about the property before that point.

65. Finally, after these first two phases, the property moves to the third phase and goes active on the MLS and is sent by the MLS to tens of thousands of internet websites and data vendors. The homeowner and agent benefit from the pre-MLS phases because they will have provided insight on pricing, staging, and marketing strategy. Some listings sell before reaching broad MLS distribution, but more than 93% continue to the third phase, listing on the MLS.

66. The listing is the homeowner's advertisement for the home. Like any seller of property, the homeowner is entitled to say whatever she wants in the listing to sell the home so long as the listing complies with the law. And, just like a seller of anything, a homeowner should not be forced to put things into their advertisement that hurt the homeowner unless required by the law. A homeowner should not be forced to tell a buyer all the ways that the buyer can negotiate against the homeowner.

67. The phased marketing strategy has several advantages for homeowners.

68. ***First,*** because MLSs put the history of price changes onto the listing, and price cuts are perceived by buyers as signaling desperation, homeowners often forgo asking a higher price at the outset to avoid the risk of having to cut the price and reduce their bargaining leverage relative to buyers. This can prevent homeowners from obtaining the full value of their properties. By testing an aspirational price in a pre-MLS phase, homeowners may obtain a higher price with less risk of a price cut later. A pre-MLS listing also avoids third-party aggregators applying their own flawed pricing algorithms to public listings, which could reduce the amount potential buyers might offer for the property.

69. ***Second***, because off-MLS pre-marketing reduces the risk to homeowners of attempting to market their property before making costly upgrades, renovations, cosmetic improvements, professional photographs, or other investments, off-MLS pre-marketing can save the homeowner the costs of making such investments.

70. ***Third,*** MLSs publish the number of days a listing has been on the MLS, and a higher number is likewise perceived by buyers as increasing their bargaining leverage relative to sellers. Pre-MLS marketing allows homeowners to test the market, build buyer interest, and refine their strategy without incurring days on the market.

71. ***Fourth,*** pre- and off-MLS marketing offer the chance to sell a house without the inconvenience that comes with publicly listing it for sale and offer the chance to assess whether expensive renovations are necessary to make the house more attractive to the broader market. Indeed, a homeowner may not yet be fully convinced that they want to sell the property or may want to avoid disruptive showings.

72. See It First™ on Compass offers homeowners the ability to market a property prior to full preparation, which may allow homeowners to reduce or avoid the costs, time, and risks associated with pre-sale improvements, while retaining the option to accept or decline early offers. Indeed, reported transactions are consistent with these benefits. For example, a homeowner experiencing a time of distress needed to sell her property quickly and was able to secure a buyer within a short period, without dimensions or even pictures through pre-marketing. Compass agents appreciate the ability to offer innovative strategies that help homeowners achieve their goals.

73. This phased marketing strategy is good for homeowners, good for agents seeking to represent homeowners, and good for Compass. Compared with listings sent directly to an active

MLS feed, properties marketed through Compass' phased marketing strategy sold for 4.6% more, had 34% fewer days on the MLS and experienced 29% fewer price cuts. The phased marketing strategy does, however, threaten incumbent brokerages by forcing them to compete against Compass for homeowner clients and for agents who want to offer such innovative marketing strategies to their homeowner clients.

74. Homeowner demand for phased marketing has been substantial in the many areas of the country where MLSs allow Compass to offer it. By March 2025, approximately 48% of Compass homeowners selected phased marketing. After March 2025, the percentage of phased marketing listings fell due to Zillow's adoption of "Listing Access Standards" banning pre-marketed listings from Zillow and affiliated sites. The Listing Access Standards are similar to the Anticompetitive Rules in that they deny access to a public marketing platform, in that case Zillow's, based solely on the homeowner's decision to first market a property by other means. In a recent federal antitrust case, Zillow argued that its Listing Access Standards promoted competition by reducing pre-MLS marketing, but the court held both that Zillow failed to prove its claims and that the "record . . . identifie[d] plausible procompetitive effects from" strategies such as Compass' phased marketing strategy.[75]

75. Recognizing the benefits of pre- and off-MLS marketing for many homeowners, many MLSs do not penalize agents and homeowners for such marketing. MLSs serving more than

---

[75] *Zillow Group, Inc. v. Midwest Real Est. Data LLC*, No. 1:26-cv-05451, Mem. Op. & Order 43–44 (N.D. Ill. Sept. 15, 2026), ECF No. 141.

350,000 brokers and agents in at least 12 states allow homeowners to publicly market their properties, and those MLSs continue to succeed.

***Anticompetitive Effects***

76. The Anticompetitive Rules restrain trade in several ways.

77. ***First***, because REcolorado's participating brokers and agents compete directly with one another and with Compass and its agents for homeowners and homebuyers, implementation and enforcement of the Anticompetitive Rules block competition from agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported, "On its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[76]

78. ***Second***, REcolorado is blocking competition by other public marketing methods, identified by Appendix A as flyers, yard signs, email blasts, multi-brokerage listing-sharing networks, social media, applications available to the general public, and public-facing websites, and, most significantly, the Compass website itself.

79. ***Third***, the Anticompetitive Rules also reduce competition among brokers, including Compass, by preventing them from competing through the timing, sequence, and scope of a listing's distribution.

---

[76] Butters Report at 130.

80. ***Fourth***, the Anticompetitive Rules further reduce competition among brokers, including Compass, by preventing them from competing to attract agents by offering them innovative, appealing ways to serve their homeowner clients.

***REcolorado's Justifications Are Pretextual***

81. REcolorado has no valid justification for its illegal conduct. REcolorado operated without such rules before 2020, and many MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed. These rules are not required for operating a successful MLS. These are not rules that ensure the integrity of the data distributed by REcolorado or prohibit its members from selectively editing or excluding the REcolorado listings they show their buyer clients. The Anticompetitive Rules govern marketing itself and require brokers and their clients to forgo profitable strategies on pain of being fined by or excluded from the MLS.

82. REcolorado's restraints on competition are not about "transparency." REcolorado does not allow homeowners or homebuyers to become members or to directly access its database. REcolorado accepts listings only from licensed brokers under a listing agreement—not from homeowners selling their own homes. And REcolorado's own rules allow listings to be hidden from other brokers, as "Private Exclusives," just as long as they are not publicly marketed.[77] Nor are REcolorado's restraints about equal access for buyers; any buyer, and any buyer's agent, can learn about, tour, and make an offer on a property marketed through See It First™ on Compass without hiring a Compass agent. Indeed, without See It First™ on Compass as an option, some

---

[77] MLS Policy §§ 1.0, 1.02, 1.5; *id.*, Glossary (defining "Participant").

homeowners would not choose to sell their property, ultimately reducing the inventory of homes on the market.

83. REcolorado's restraints also have nothing to do with "free-riding." In its lawsuit against Compass, REcolorado has accused Compass of "free riding" on the MLS by participating when it chooses but otherwise withholding listings from the MLS.[78] That is nonsense. In the first place, Compass does not seek special treatment. If Compass has its way, ***every*** member of REcolorado will be free to offer pre- and off-MLS marketing strategies to their clients.

84. Compass does not benefit from the contributions of other brokerages to the MLS without contributing to the benefits that other brokerages can obtain from the MLS. Compass contributes substantially to the benefits obtained by other brokerages and would continue to do so under the See It First™ on Compass program. Compass provides value to REcolorado and its members in three critical ways: (1) by exposing its buyer clients to listings submitted by other members; (2) by submitting listings to REcolorado post-sale even when they were not previously submitted to REcolorado, adding to the body of information that members use for advising clients on pricing and other matters; and (3) by submitting listings to REcolorado for the benefit of all buyer agents in the REcolorado service area after the first two phases of the phased marketing strategy, which would happen for over 93% of all pre-marketed listings based on experience elsewhere. Indeed, Compass is a significant contributor of listings to REcolorado.

85. In its lawsuit, REcolorado asserted other arguments about the purported drawbacks of pre- and off-MLS marketing that amount to little more than paternalistically telling homeowners

---

[78] ARMLS Am. Compl. ¶¶ 55–56.

and their agents what is best for them. REcolorado claims, for example, that buyers need the days-on-market and price-history data that MLS listings display in order to gauge a home's value—even though those data appear in the homeowner's own advertisement only because the MLS puts them there.[79] Competition requires innovation, and consumers will ultimately decide what innovations are worthwhile.

86. REcolorado's purported alternatives do not cure the restraint. REcolorado's "Private Exclusive" option under Section 1.02, its version of an office exclusive, read together with Section 1.0 and Appendix A, requires that the property be kept hidden and marketed only privately, one-to-one—no yard sign, no website, no social media post, and no open house.[80] If any public marketing occurs, the listing must be distributed in the full MLS. And a Private Exclusive is available only at the seller's written direction, only for residential property, and must itself be submitted to REcolorado.[81] REcolorado's "Coming Soon" status is no cure either: it lasts no more than seven days, and showings are prohibited.[82]

---

[79] *See* ARMLS Am. Compl. ¶ 40.

[80] MLS Policy §§ 1.02, 1.5.

[81] MLS Policy §§ 1.0, 1.02, 1.5. The DOJ views mandatory-listing policies, coupled with "exceptions benefitting primarily large brokerages," as anticompetitive. Supplemental Statement of Interest of the United States, *Nosalek v. MLS Prop. Info. Network, Inc.*, No. 1:20-cv-12244-PBS, ECF No. 358, at 7 n.2 (D. Mass. Mar. 17, 2025). REcolorado's Private Exclusive option is precisely the sort of "exception" that makes the Anticompetitive Rules unlawful.

[82] MLS Policy § 1.3, Glossary (defining "Coming Soon").

***Antitrust Injury to Compass, Its Agents, and Homeowners***

87. REcolorado's conduct causes significant, direct harm to Compass, its agents, and consumers. The harm resulting from this anticompetitive scheme encompasses the following:

(a) **Lost Commissions and Financial Harm to Brokerage**: Compass has suffered direct financial harm through lost commissions due to Compass' inability to offer homeowners its phased marketing strategy, a superior product that attracts homeowners to Compass. Compass has also suffered direct financial harm through lost revenue from those homeowners through ancillary services, such as title and escrow services and mortgage services.

(b) **Degradation of Compass Website**: The enforcement of the Anticompetitive Rules degrades Compass' proprietary technology platform by preventing Compass from posting pre-MLS listings in See It First™ on Compass, artificially suppressing web traffic and prospective leads.

(c) **Depressed Sales Prices and Lost Sales**: By eliminating Compass' ability to pre-market and test pricing, REcolorado rules force homeowners to launch blind on the MLS, frequently resulting in mispricing that depresses final home values, in lost sales, and in reduced commissions.

(d) **Excessive Days on Market and Public Price Drops**: Forcing properties onto the MLS prematurely subjects them to the stigma of accumulating "days on market" and price reductions on the listing, which depress sale prices and related sales commissions.

(e) **Lost Agents**: The Anticompetitive Rules prevent Compass from competing against other brokerages for agents by offering agents innovative pre-marketing strategies that they can offer their clients. In addition, on information and belief, REcolorado has structured its data licensing so that the listing and transaction data Compass and its agents must submit—including Compass agent listing and transaction data—may be licensed to third-party software vendors, whose products brokerages can use to target and recruit Compass agents. REcolorado requires every Participant to grant it a "sublicensable, perpetual" license to all listing content and claims the right to license its MLS Database "to any third party including, without limitation, to . . . Brokerage Firms, brokerage back office system Vendors, and IDX Vendors, for any lawful purpose reasonably deemed appropriate by REcolorado."[83] REcolorado licenses "Back Office" data feeds to vendors for "[m]arket analytics dashboards" and "[b]rokerage reporting systems."[84] And REcolorado itself provides every subscriber with reports that "[r]ank[] agents . . . by sold listings, including total transaction volume," and markets its office production reports to managing brokers as "a great way to attract top talent."[85] Until October 2026, REcolorado also delivered its data to vendors through MLS GRID, whose standard data license authorizes licensees to use the data for "Agent-Production

---

[83] Participation Agreement § 4.2.

[84] *Data Delivery – Bridge*, REcolorado, https://recolorado.com/data/.

[85] *REcolorado Matrix: Productivity Reports*, REcolorado, https://recolorado.com/recolorado-matrix-productivity-reports/.

Analytics"—that is, "creating agent transaction analytics for internal use or public display."[86] The data that REcolorado forces Compass and its agents to give to the MLS should not be licensed on terms that permit technology companies to use those data in agent-recruitment products. An MLS that licenses its data on terms that permit competitor recruitment tools strays far beyond the core mission of an MLS—it exposes Compass' operational data to use against Compass for competitor poaching.

(f) **Loss of Convenience and Harm to Innovation**: Homeowners are stripped of convenience surrounding their home sale, and consumers suffer from the commoditization of agent services and a reduction in pro-competitive choice.

88. Compass and its agents and homeowners have thus suffered antitrust injury as a result of the rules imposed by REcolorado and the agents and brokerages who control it. REcolorado's rules are anticompetitive because they foreclose homeowners and their agents from choosing a marketing strategy—limited, staged listing—that a substantial share of the market demands, thereby reducing product variety and consumer choice in the Relevant Markets. This restraint on competition directly causes Compass' injury: because Compass' phased marketing offering depends on the very marketing flexibility that the Anticompetitive Rules foreclose,

---

[86] MLS GRID Data License Agreement §§ I (defining "Agent Production Analytics"), V(f)(vi), https://mlsgrid.com/s/MLS-GRID-Data-License-Agreement.pdf; *Authorize Your IDX or VOW Vendor in Bridge Interactive*, REcolorado (Oct. 15, 2026), https://recolorado.com/authorize-your-idx-or-vow-vendor-in-bridge-interactive/ (REcolorado "is moving its data delivery platform from MLS Grid to Bridge Interactive"); MLS Policy §§ 14.1–14.3 (referring to "MLS GRID Data" and the "MLS GRID IDX Master Data License Agreement").

REcolorado's rules prevent Compass from offering phased marketing to homeowners and agents in the REcolorado service area, making Compass less competitive in the Brokerage Services Market and the Agent Services Market. The mechanism of harm to competition and the mechanism of harm to Compass are one and the same: REcolorado's rules prevent Compass from offering homeowners and agents innovative strategies they want.

89. Compass is therefore a proper party to bring this action. Compass' injury is direct, not derivative: it flows immediately from REcolorado's rules and their enforcement against Compass agents and their homeowner clients. Compass' damages, including lost commissions, lost revenue from ancillary services, and diminished value of its technology platform, are neither speculative nor unduly complex to ascertain.

***REcolorado's Rule Enforcement Against Compass***

90. REcolorado has continued to enforce the Anticompetitive Rules against Compass even after Compass' demand. On October 8, 2026—after Compass sent its demand letter, and after REcolorado had asked for and received an extension of time to respond—REcolorado's Data Accuracy Department sent Compass agents "Mandatory Submission 1st Notice[s]" for two Compass listings, at 1210 Ivy Street in Denver and 7825 S. Kalispell Circle in Englewood, because each property was "being publicly marketed" on Redfin but was not yet active in the MLS. Each notice demanded that the listing be entered into the MLS as a Coming Soon or Active listing by the next morning "[t]o avoid a violation and a $100 fine being assessed to your account," and warned that "removing the marketing does not cure the violation." By enforcing the Anticompetitive Rules through escalating warnings and fines, competitors' anonymous reports,

and the threat of suspension and termination from the MLS, REcolorado has made it impossible for Compass to perform its obligations in accordance with homeowners' instructions.

91. On September 14, 2026, Compass demanded that REcolorado cease fining or punishing its agents for publicly marketing office exclusive listings, and asked REcolorado to confirm by October 6, 2026, that it would do so.[87] Based on a request from REcolorado, Compass extended the deadline to November 6, 2026. REcolorado never responded to the substance of Compass' demand. Instead, on October 21, 2026—more than two weeks before the extended deadline that REcolorado itself had requested—REcolorado joined five (now six) other MLSs in suing Compass in the Southern District of New York, across the country from the Denver metropolitan region, seeking a declaration that its rules do not violate the Sherman Act or the Colorado State Antitrust Act of 2023 and an injunction barring Compass from suing it over those rules.[88] REcolorado filed that action in anticipation of this one, in an effort to deprive Compass of its choice of forum.

***REcolorado's Continuing Violations***

92. REcolorado's anticompetitive conduct is ongoing. The Anticompetitive Rules are not merely rules adopted in the past; they are a continuing agreement among competing brokers to penalize and exclude any broker or agent who follows a homeowner's instruction to publicly market a home outside the MLS, and REcolorado enforces that agreement through escalating

---

[87] ARMLS Am. Compl. Ex. N.

[88] *See* ARMLS Am. Compl. ¶¶ 86–93; 104–08 & Prayer for Relief ¶¶ A, D, F.

warnings and fines, referral to its MLS Policy Council, and the threat of suspension and termination.[89]

93. Within the four years before this complaint was filed, REcolorado and its co-conspirators have committed new and independent acts that renew the restraint and inflict new and accumulating injury on Compass, including:

(a) issuing new "Mandatory Submission" notices to, and threatening fines against, Compass agents for violating the Anticompetitive Rules, including on October 8, 2026;

(b) re-adopting and re-issuing the Anticompetitive Rules, including in the versions of its MLS Policy dated November 2025 and April 2026;

(c) appointing members of its MLS Policy Council and Fine Waiver Appeal Team to amend the rules and decide alleged violations;

(d) declining to respond to the substance of Compass' demand and, on October 21, 2026, suing Compass for a declaration that its rules are lawful; and

(e) continuing, each day, to prohibit Compass and its agents from publicly marketing listings in accordance with homeowners' instructions.

94. Each of these acts required REcolorado to make a fresh, discretionary decision to maintain, tighten, or enforce the Anticompetitive Rules—a decision REcolorado was free not to make. Each act caused Compass new injury—lost commissions, lost ancillary revenue, lost agents, and diminished value of its technology platform—that Compass could not have recovered in an

---

[89] MLS Policy §§ 1.0, 8.1–8.3.

earlier action because that injury had not yet occurred. Compass seeks damages for injuries caused by acts within the applicable limitations periods, and its claims for injunctive relief are timely because REcolorado continues to maintain the Anticompetitive Rules and to threaten their enforcement today.

## CAUSES OF ACTION

### COUNT I
### *PER SE* ILLEGAL GROUP BOYCOTT
### IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

95. Compass repeats and incorporates by reference each of the foregoing paragraphs of the Complaint.

96. REcolorado's Participants and Subscribers who have agreed to and enforce the Anticompetitive Rules are direct competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. They are therefore horizontal competitors with each other and with Compass.

97. Through the Anticompetitive Rules, REcolorado forces Compass and its agents to forgo either (1) a critical input to their business (access to REcolorado in the REcolorado service area) or (2) the ability to offer innovative pre- and off-MLS marketing strategies to homeowners and agents.

98. The agreement by and among REcolorado and its Participants to implement and enforce these rules is, therefore, a *per se* group boycott—a *per se* illegal combination, contract, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Per se* treatment is warranted because REcolorado possesses market power in the MLS Market in the REcolorado service area; it controls access to an input—MLS participation—that agents need to compete

effectively in the REcolorado service area; and the challenged rules lack any plausible efficiency justification, because they govern agents' marketing to the public rather than the integrity or sharing of data within the MLS.

99. As a direct and proximate result of REcolorado's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

**COUNT II**
**COMBINATION, CONTRACT, AND CONSPIRACY CONSTITUTING UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)**

100. Compass repeats and incorporates by reference each of the foregoing paragraphs of the Complaint.

101. REcolorado is the dominant MLS in the REcolorado service area. Membership in REcolorado and access to the MLS it operates is critical for agents working in the REcolorado service area. REcolorado's rules are agreed to and enforced by agents and brokerages who are horizontal competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. REcolorado and the agents and brokerages who have agreed to its rules are using REcolorado to restrain competition in the Brokerage Services Market and the Agent Services Market by implementing and enforcing the Anticompetitive Rules, which prevent Compass from offering See It First™ on Compass to its homeowner clients and agents and prevent any other agent from offering innovative pre- and off-MLS marketing strategies.

102. The rules' anticompetitive effects—reduced product variety, reduced competition among brokers on the timing, sequence, and scope of listing distribution, and reduced competition

for agents—substantially outweigh any pro-competitive benefit. Any legitimate objective could be achieved through substantially less restrictive means, including the homeowner-instruction option REcolorado offered before 2020 and the rules of the many MLSs that permit pre-MLS public marketing. Alternatively, the anticompetitive character of the rules is obvious enough to warrant an abbreviated, "quick look" analysis.

103. As a direct and proximate result of REcolorado's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

**REQUESTED RELIEF**

Compass requests the following:

(a) A declaration that the Anticompetitive Rules are an unlawful restraint of trade under 15 U.S.C. § 1;

(b) An injunction prohibiting REcolorado from adopting, maintaining, or enforcing the Anticompetitive Rules, or any similar rule, to penalize any Participant or Subscriber for publicly marketing a property that the homeowner has directed be withheld from, or submitted later to, the MLS;

(c) An award of treble actual, compensatory, and consequential damages in an amount to be proven at trial in addition to pre- and post-judgment interest as allowed by law;

(d) An award of Plaintiffs' attorneys' fees and costs of suit; and

(e) Such other relief that the Court deems just and equitable.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Compass hereby demands a trial by jury as to all claims so triable.

Dated: November 12, 2026

Respectfully submitted,

*/s/ Adam B. Stern*
Adam B. Stern
Shoemaker Ghiselli + Schwartz LLC
1811 Pearl Street
Boulder, Colorado 80302
Telephone: 303-923-8672
astern@sgslitigation.com

EIMER STAHL LLP
Nathan P. Eimer (*admission forthcoming*)
Vanessa G. Jacobsen (*admission forthcoming*)
Alec Solotorovsky (*admission forthcoming*)
Brian Y. Chang (*admission forthcoming*)
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600
neimer@eimerstahl.com
vjacobsen@eimerstahl.com
asolotorovsky@eimerstahl.com
bchang@eimerstahl.com

*Attorneys for Plaintiffs Compass, Inc. and Compass Colorado, LLC*